IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MITCHELL THOMAS, | ) | |
| | ) | |
| *Plaintiff*, | ) | 08 CV 4456 |
| v. | ) | |
| | ) | |
| THERESA CLAY, in her individual capacity, and DIANE MORRISON, in her individual capacity, | ) | Honorable David H. Coar |
| *Defendants*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mitchell Thomas ("Thomas") filed a third amended complaint against Defendants Theresa Clay ("Clay") and Diane Morrison ("Morrison") (collectively "Defendants"), pursuant to 42 U.S.C. § 1983. In it, he alleged that defendants violated his Eighth and Fourteenth Amendment rights by failing to provide timely and adequate medical treatment. Defendants' motion for summary judgment is now before this Court. For the reasons set forth below, the motion is GRANTED.

**FACTS**

I. **Thomas's Medical Treatment**

Thomas was a pretrial detainee at the Cook County Department of Corrections ("CCDOC"). (Defendants' Rule 56.1 Statement of Facts ("Def. SOF") ¶ 2.) On June 30, 2007, Thomas was allegedly attacked by another detainee while housed in the Residential Treatment Unit ("RTU"). (Def. SOF ¶ 7.) Thomas testified that, as a result of the attack, he suffered an

1

injury to his right shoulder and started to experience headaches. (Def. SOF ¶ 8.) That same day, Thomas was seen by an unidentified nurse in the dispensary. Thomas told the nurse that he did not require treatment because he thought the pain was going to go away. (Def. SOF ¶ 13.) However, Thomas continued to experience pain in his shoulder on July 1, 2007. (Def. SOF ¶ 14.) He requested, and was given, Tylenol from the nurses in the RTU. (Def. SOF ¶ 14.)

On July 2, 2007, Thomas saw a doctor and complained of pain to his right shoulder and lower back, in addition to headaches. The doctor ordered x-rays for the Plaintiff's shoulder and back and prescribed 600mg of Motrin for ten days. (Def. SOF ¶ 15.) On July 3, 2007, Thomas's right shoulder and back were x-rayed. The x-rays revealed a slight tapering of the lateral aspect of the clavicle and a 6mm separation of the acromioclavicular ("AC") joint. (Def. SOF ¶ 16.) On July 24, a doctor examined Thomas and prescribed 500mg of Naprosyn for seven days to alleviate his pain. (Def. SOF ¶ 17.)

Over the next seventeen months, while Thomas was incarcerated at CCDOC, he continued to receive treatment for his right shoulder and headaches. On August 8, 2007, a doctor examined Thomas and ordered additional x-rays, referred Thomas to an orthopedist, and scheduled a follow-up appointment. (Def. SOF ¶ 18.) X-rays were taken on August 13, 2007. (Def. SOF ¶ 19.) On August 21, 2007, Thomas saw a physician's assistant ("PA"). The PA made a referral to an orthopedist, prescribed Tylenol for three days, and scheduled a follow-up. (Def. SOF ¶ 20.) Thomas was seen by an orthopedist on August 23, 2007. (Def. SOF ¶ 21.) Thomas was x-rayed, prescribed 500mg of Tylenol for three weeks, given a sling, and scheduled for another appointment on December 12, 2007. (*Id.*; Def. SOF ¶ 41.)

Thomas was again examined by a doctor on October 2, 2007, who prescribed 500mg of Tylenol for three weeks for right shoulder pain. (Def. SOF ¶ 23, 42.) Thomas saw the doctor

once more twelve weeks later. (Def. SOF ¶ 23.) On November 14, 2007, an orthopedist saw Thomas, recommended physical therapy, and prescribed 500mg of Naprosyn for two weeks to alleviate shoulder pain. (Def. SOF ¶ 24, 43). Still complaining of pain and intermittent headaches, Thomas saw a doctor on December 19, 2007. (Def. SOF ¶ 25.) The doctor prescribed 500mg of Naprosyn for eight weeks, for his shoulder, and 750mg of Robaxin for eight weeks, for his headaches. (*Id.*; Def. SOF ¶ 44.) Beginning on March 12, 2008, Thomas was prescribed 750mg of Robaxin and 650mg of Tylenol for eight weeks. (Def. SOF ¶ 45.) On May 7, 2008, Thomas was prescribed 750mg of Robaxin and 325mg of Tylenol for eight weeks. (Def. SOF ¶ 46.)

On June 19, 2008, Thomas was prescribed 600mg of Motrin for seven days. (Def. SOF ¶ 47.) On July 9, 2008, Thomas appeared as a walk-in during sick call, complaining of pain in his right shoulder and headaches. (Def. SOF ¶ 29.) The PA recommended that Thomas continue with his physical therapy and home exercises, renewed his prescription for Tylenol and Robaxin, made another referral to an orthopedist and scheduled a follow-up appointment. (Def. SOF ¶ 29.) Two days later, on July 11, 2008, Thomas saw another doctor. (Def. SOF ¶ 30.) Thomas complained that the physical therapy was not working and requested surgery. (*Id.*) The doctor discontinued the Robaxin, prescribed an increased dose of 600mg of Motrin for eight weeks, entered a consultation with an orthopedist, and scheduled a follow-up appointment. (*Id.*; Def. SOF ¶ 48.) The orthopedist saw Thomas on August 7, 2008, and recommended that he work on his range of motion, receive an MRI, and continue on Motrin. (Def. SOF ¶ 31.) Thomas was prescribed 800mg of Motrin for three weeks. (Def. SOF ¶ 49.) An x-ray taken of Thomas's shoulder that day revealed no changes from a year earlier. (Def. SOF ¶ 32.)

On September 4, Thomas was prescribed and received as needed 800mg of Motrin for two weeks. (Def. SOF ¶ 50.) Thomas arrived for a follow-up appointment with a doctor on September 5, 2008 and saw an orthopedist on October 2, 2008. (Def. SOF ¶ 33, 34.) The orthopedist made a referral for elective surgery on Thomas's right shoulder. (*Id.*) Thomas was prescribed 800mg of Motrin for three weeks. (Def. SOF ¶ 51.) Thomas saw an occupational therapist on January 14, January 28, March 24, April 7, and May 20, 2008. (Def. SOF ¶ 35.)

In October and November of 2007, and January, March, June, September, and November of 2008, Thomas filed grievances stating that his pain medication was not working and that only surgery could relieve his right shoulder pain. (Def. SOF ¶ 64.) In denying Thomas's initial grievance, the CCDOC Appeal Board declined to order an immediate surgery because Thomas's case was not considered urgent. (Def. Ex. 7 at 240.) Thomas was eventually scheduled to have surgery on his shoulder on November 28, 2008, but he was transferred to the Illinois Department of Correction ("IDOC") on November 21, 2008. (Def. SOF ¶ 65). IDOC provided Thomas with the same methods of treatment he received while at CCDOC; he received medication, had an MRI, and was directed to participate in physical therapy. (DEF. SOF ¶ 66). On November 10, 2009, Thomas underwent surgery to repair his shoulder at the University of Illinois at Chicago. (Plaintiff's Statement of Facts ("Pl. SOF") ¶ 72.)

## II.     Nurses Clay and Morrison

Clay and Morrison are Licensed Practical Nurses working in the RTU, also known as Division Eight or the psychiatric unit, while Thomas was detained. (Def. SOF ¶ 3, 4.) Thomas was moved from the RTU to Division Ten in May 2008. (Thomas Dep. 17:20-18:2, 58:5-9.)

Clay and Morrison did not work in Division Ten. (*Id.* at 62:2-6; Clay Dep. 7:14-21; Morrison Dep. 6:22-24.)

Clay and Morrison's responsibilities include dispensing medication, treating patients, changing dressings, and handing out referrals for sick call. (*Id.*) When a problem is referred to a doctor, the nurse's role ends after she submits the sick call slip to the secretary, who schedules an appointment. (Clay Dep 20:3-4, 24:24-25:3.) Clay and Morrison are authorized to provide over-the-counter medications like Tylenol to inmates without a doctor's order, upon request. (Def. SOF ¶ 54.) However, if an inmate has received Tylenol for three to five days in a row, the nurses were not supposed to administer Tylenol. (*Id.*) Ice packs or heat packs are distributed with a doctor's order or as first aid immediately after an injury has occurred. (Def. SOF ¶ 55.) These packs could not be passed out in the psychiatric unit without a doctor's order, to guard against inmates ingesting the contents. (*Id.*; Morrison Dep. 26:18-27:3.)

Thomas testified that Clay and Morrison never denied him his prescription medication. (Thomas Dep. 65:18-24.) He testified that he received all of his prescribed pain pills on a daily basis or consistently. (*Id.* at 42:5-11.) His medication administration records show that he received the vast majority of his prescribed medications. (Def. SOF ¶ 38-51.) The record indicates that some doses of Tylenol or Motrin were not administered in August 2007, October 2007, March 2008, May 2008, and August 2008. (Def. Ex. 3 at 512, 516, 520-22, 524-27, 536, 540; Morrison Dep. 23:14-21.) Defendants explain that those pills were prescribed and distributed on an as-needed basis, whenever Thomas requested them. (Def. SOF ¶ 41, 42, 45, 46, 49; Morrison Dep. 22:20-23:4, 24:4-9.) This has not been disputed.

While Thomas takes no issue with his prescription medications, he alleges that Clay and Morrison, on at least ten occasions each, denied his requests for sick call slips, Ben Gay, ice

packs or heat packs, or non-prescription Tylenol. (*Id.* at 43:7-14; 65:20-24; 67:23-68:9.) The nurses denied his requests for ice packs or heat packs around four or five times each. (*Id.* at 66:1-8.) When denying his requests, Clay and Morrison would allegedly respond "Wait till you see the doctor." (*Id.* at 41:1-12; 43:7-14.) Clay ultimately took three sick call slips from Thomas on July 16, August 8, and August 17, 2007. (Pl. SOF ¶ 79.) Each time, she gave Thomas a single dose of non-prescription-strength Tylenol. (*Id.*)

Defendants dispute that they refused any of Thomas's requests, pointing to the fact that Thomas's allegations are unsupported by any evidence other than his own deposition testimony. Still, the Court, in viewing the evidence in Thomas's favor, must assume the above for the purposes of this motion.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's

favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

## ANALYSIS

This case presents something of a moving target. Thomas is clearly unhappy with the course of treatment he received at CCDOC. However, he does not deny that he received immediate and ongoing treatment for his separated AC joint, in the form of seventeen months of medical examinations, physical therapy, prescription medication, and an eventual referral for elective surgery. After terminating his physicians as defendants, Thomas focused his complaint on his nurses, who are not authorized to proactively administer anything beyond over-the-counter Tylenol and doctors' referrals. While Thomas's deposition testimony indicates his frustration with Clay and Morrison's denial of his requests for Tylenol, heat and ice packs, Ben Gay, and sick call slips, his response brief focuses on Defendants' failure to administer three days of Tylenol as opposed to one day's dosage, whenever they did respond to his requests.

As best as the Court can discern, Thomas's constitutional claim rests on two primary grounds: (1) Clay and Morrison failed to provide Thomas adequate medical care for his right shoulder pain by refusing to provide heat and ice packs, Ben Gay, or non-prescription Tylenol on multiple occasions, or by limiting administrations of non-prescription Tylenol to a single day's dose, as opposed to the maximum three to five days' dosage; and (3) Clay and Morrison delayed Thomas's access to follow-up medical care for his right shoulder pain by failing to reliably

7

supply him with sick call slips or make timely doctors' referrals. (Thomas Dep. 89:17-90:18.)

I.   **The General Standard**

A pretrial detainee is afforded certain protections under the Fourteenth Amendment, including access to medical care. *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007). These protections are at least as great as those afforded a convicted prisoner under the Eighth Amendment. *Id.* As a result, courts generally apply the analogous standards of Eighth Amendment jurisprudence to pretrial detainees' claims of inadequate medical care. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002).

Deliberate indifference to serious medical needs of prisoners, resulting in the denial or delay of treatment, violates the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Not all medical needs are serious; they may range from a need for immediate life-saving intervention to a desire for the alleviation of trivial discomforts. *Ralston v. McGovern,* 167 F.3d 1160, 1161-62 (7th Cir. 1999). A deliberate refusal to treat needs at the top of this range clearly violates the Eighth Amendment, whereas a deliberate refusal to treat needs at the bottom of this range does not. *Id.*

To survive a summary judgment motion, Thomas must show that a genuine issue of material fact exists as to two requirements, as set forth in *Farmer v. Brennan. See Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (citing *Farmer,* 511 U.S. 825, 834 (1994)). Under the *Farmer* test, a denial of medical treatment violates the Eighth Amendment if: (1) the alleged deprivation is "objectively, sufficiently serious," so as to constitute the "denial of the minimal civilized measures of life's necessities;" and (2) the defendant effects the deprivation with a "sufficiently culpable state of mind," specifically one of "deliberate indifference" to inmate

8

health or safety. *Farmer*, 429 U.S. at 104. In the medical care context, the first element of the *Farmer* test requires that the inmate has an objectively, sufficiently serious medical need. *See Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir. 1996).

## II. Denial of Adequate Medical Care

Thomas claims that Clay and Morrison denied him adequate medical care by refusing his requests for heat and ice packs, Ben Gay, or Tylenol, and by limiting discretionary disbursements of Tylenol to a single day's dose, as opposed to the maximum dosage of three to five days. As a preliminary matter, the Court finds unavailing Thomas's objections to the denial of heat packs, ice packs, or Ben Gay. Thomas admits that Clay and Morrison, in the absence of a doctor's order, can only distribute heat or ice packs as first aid immediately after an injury has occurred. (Def. SOF ¶ 55.) Moreover, these packs could not be passed out at all in Thomas's psychiatric unit without a doctor's order. (*Id.*) Because Thomas has not alleged the existence of such an order, no liability can arise from Defendants' refusal to provide the packs. The same goes for Defendants' distribution of Ben Gay. Clay testified that nurses do not carry Ben Gay, (Clay Dep. 38:2-12), indicating that there was none to withhold. Since the point is never disputed or even raised by Thomas, the Court finds groundless Thomas's objection to the denial of Ben Gay. This leaves Clay and Morrison's alleged refusal to dispense Tylenol, or dispense three days of Tylenol as opposed to one, as the only basis for Thomas's claim.

### A. Objectively, Sufficiently Serious Medical Need

Normally, it is improper to separately analyze the constitutionality of actions treating a plaintiff's primary injury and actions treating his pain. *Snipes v. DeTella*, 95, F.3d 589, 591 (7th Cir. 1996) (holding that a doctor's decisions to remove a toenail and to refrain from using local

9

anesthetic should not be independently subjected to deliberate indifference scrutiny). However, Thomas's claim is anomalous in that his named defendants lacked authority to prescribe or modify the treatment of his primary injury, as developed by Thomas's doctors, specialists, and therapists. As such, the serious medical need disregarded by Defendants' withholding of relief cannot be the need to repair Thomas's separated AC joint. Rather, the subject of the Court's analysis must be Thomas's need to alleviate the constant shoulder pain caused by his injury.

Severe pain, by itself, can result in a "serious medical need," such that denial or delay of pain medication violates the "minimal civilized measure of life's necessities." *See Cooper v. Casey,* 97 F.3d 914, 917 (7th Cir. 1996); *Ralston,* 167 F.3d at 1161-62. Pain to this degree may arise from injuries sustained by victims of physical assault. *See, e.g.*, *Cooper,* 97 F.3d at 917 (potential Eighth Amendment violation where prison guards denied plaintiffs immediate access to pain medication after they kicked, beat, and maced plaintiffs, inflicting cuts, severe muscular pain, and a burning sensation in their eyes and skin); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (inmate who had been beaten unconscious by another inmate presented a constitutional claim where prison officials delayed treatment of his severely painful broken nose, which required eventual surgery). The question here is whether Thomas was in so much pain that the denial of over-the-counter Tylenol was "objectively, sufficiently serious" to constitute a violation of the Eighth Amendment. *Farmer*, 429 U.S. at 104.

Thomas described his lingering shoulder pain as "an ache" that increased when he laid on his right side. (Thomas Dep. 38:1-13.) The pain interfered with his ability to sleep, put on his clothing, unscrew the top of jars, and brush his teeth. (*Id.* at 38:5-8; 40:3-17.) Thomas testified that "[i]t's just the little normal things that I learned that we take for granted that, you know, a lot of things that we – that you normally do, you know, it's discomfort, it hurts." (*Id.* at 40:13-17.)

Taking Thomas's words at face value, it does not appear that he has directly alleged pain severe enough to reach constitutional proportions. *See, e.g.*, *Reed*, 178 F.3d at 855 (extreme pain, internal bleeding, violent cramps and periods of unconsciousness); *Ralston,* 167 F.3d at 1161-62 (pain from swallowing and spitting blood, due to blistering in inmate's mouth and throat from cancer radiation therapy)*; Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (abdominal pain, fever, and chills from surgical wound infection, which required lancing and draining several times); *Cooper,* 97 F.3d at 917 (severe muscular pain immediately after a beating);  *Grieveson*, 538 F.3d at 779 (freshly broken nose from an assault the day before).

Nevertheless, pain is a subjective phenomenon that is difficult to quantify.  *See Cooper,* 97 F.3d at 917.  The Court notes that Thomas's doctors were prescribing him pain medication of increasing strength on a regular basis.  When viewed in the light most favorable to Thomas, this could support the inference that Thomas had an objectively, sufficiently serious medical need for pain medication.  *See Gutierrez v. Peters*, 111 F.3d 1364, 1372-73 (7th Cir. 1997) ("A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment . . . .").  Thomas's prescription history thus creates an issue of material fact as to the severity of his pain, and thus the seriousness of Defendants' alleged deprivations.

### B.  Deliberate Indifference

A defendant acts with deliberate indifference if (a) she had actual knowledge of a prisoner's serious medical need, or was aware of facts supporting an "inference of substantial risk of harm" and actually drew said inference, and (b) she responded with "reckless disregard for the known serious medical need, by inaction or woefully inadequate action." *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998) (quoting *Farmer*, 429 U.S. at 114).  Courts must

examine the totality of an inmate's medical care when considering whether a defendant's actions evidenced deliberate indifference to his serious medical needs. *See Gutierrez*, 111 F.3d at 1375.

Thomas testified that Clay and Morrison knew he was experiencing pain from his shoulder injury, although he does not elaborate on the extent of their knowledge or how they came to it. (Thomas Dep. 41:1-12, 43:7-11.) He also testified that, on the night of the assault, he noticed his bone pressing up on his skin, but mentions no other visual cues of his condition beyond that point. (*Id.* at 35:16-23.) In the three sick call slips accepted by Clay, Thomas wrote that he had a "recurring problem with headaches," his right shoulder "hurts a lot" or "hurts real bad," and "I am in discomfort with my right shoulder even when I brush my teeth." (Def. Ex. 3 at 456, 458, 464.) Clay administered a Tylenol and referred Thomas for sick call on each of these occasions. (Pl. SOF ¶ 79.)

Clay testified that she always saw Thomas mopping and never noticed any signs of pain. (Clay Dep. 14:2-13, 15:3-7.) She did wonder why he was getting different medicine after July 2007. (*Id.* at 14:4-5.) Clay examined Thomas's shoulder when he first submitted a sick call slip; she asked him to lift it up and down and took his blood pressure. (*Id.* at 21:15-23.) She did not notice any problems and gave him a Tylenol. (*Id.*) Morrison recalled that at some point, Thomas wore an arm sling, although she couldn't remember having any conversations about why he was wearing it. (Morrison Dep. 9:7-19.) Otherwise, Morrison thought Thomas looked healthy, as he was always cleaning the bathroom and mopping with both arms. (*Id.* at 24:13-16; 29:6-16.) Thomas offers nothing to dispute that he acted in any way inconsistent with Defendants' testimony.

As believably alleged by Thomas, Defendants must have known that he experienced bouts of shoulder pain and headaches. They administered occasional Tylenols and routinely

dispensed his pain medication prescriptions, Thomas's arm sling was visible for some time, and Thomas allegedly made frequent complaints. Yet, Thomas offers no evidence to suggest that Defendants actually knew or inferred that he suffered a "serious medical need" for the immediate administration of additional pain pills, or that Thomas stood at "substantial risk of harm" if he was denied an over-the-counter Tylenol after the timely expiration of his pain medication prescriptions. *See Farmer*, 511 U.S. at 838 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Of course, Thomas can show by circumstantial evidence that Defendants had inferred the presence of a substantial risk of harm. *See Reed*, 178 F.3d at 854. A fact-finder may conclude that Defendants knew of a risk from the dangerous nature of their actions or "the very fact that the risk was obvious." *Vance v. Peters,* 97 F.3d 987, 992 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997); *see also Antonelli v. Sheahan,* 81 F.3d 1422, 1427 (7th Cir. 1996) (a violation of the Eighth Amendment "must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable."). In the context of this case, withholding an over-the-counter Tylenol pill can hardly be considered a dangerous act, and the risk of denial was far from obvious. That an individual can come to serious harm from the denial of non-prescription Tylenol pill is itself a paradoxical proposition. If Thomas genuinely suffered from a serious medical need for pain medication, one would imagine that he required something more powerful. If, however, the pain Thomas felt could be alleviated by over-the-counter Tylenol, then his untreated condition would hardly be serious enough to violate the minimal necessities of civilized society. To add to this

puzzle, Thomas repeatedly testified that Tylenol – and even prescription-strength medication, for that matter – did nothing to help his shoulder pain. (Thomas Dep. 39:21-23, 50:5-14, 76:14-20.) It would be unreasonable to expect Clay and Morrison to come to a contrary conclusion when Thomas himself did not.

In sum, while the facts may not foreclose the possibility that withholding Tylenol posed "an excessive risk to [Thomas's] health or safety," the record does not favor it, nor is there any evidence that Clay and Morrison ever took the necessary inferential steps to reach it. *Farmer*, 511 U.S. at 837. It follows that their alleged refusals would not qualify as "reckless disregard for [a] known serious medical need." *Hudson*, 148 F.3d at 863 (quoting *Farmer*, 429 U.S. at 114).

In any event, the Court must examine the totality of Thomas's medical care when determining whether Clay and Morrison were deliberately indifferent to his serious medical needs. *See Gutierrez*, 111 F.3d at 1375; *Reed*, 178 F.3d at 855. The record shows that Thomas received every one of his prescription pain medications on time. (Thomas Dep. 65:18-24, 42:5-11.) Additionally, he received over-the-counter Tylenol at least three times from Clay and at least four times from Morrison. (Pl. SOF ¶ 87, 79.) Thomas testified that he was denied heat and ice packs, Ben Gay, Tylenol, or sick call slips more than ten times per defendant.[1] (Thomas Dep. 67:23-68:9.) Four or five of these times, per defendant, were requests for ice packs or heat packs, which Defendants could not distribute without a doctor's order. (*Id.* at 66:1-8.) As previously noted, nurses do not carry Ben Gay. (Clay Dep. 38:2-12.) Morrison also admitted that, often, she would refrain from giving Thomas Tylenol on days when he was already

---

[1] Thomas's deposition testimony provides the record's only reference to the frequency and timing of his allegedly denied requests. In his proposed statement of facts, Thomas belatedly attempts to use his medication administration records ("MARs") to show that, on dates in which he did not receive pain medication, he complained of pain to Clay and Morrison and was denied Tylenol and sick call slips. The blank slots in Thomas's MARs only signify that on certain dates, he did not receive pain medication. The MARs do not support the inference that Thomas interacted with Defendants, complained of pain, and was refused requests on those dates.

14

receiving prescription pain medications. (*Id.* at 18:14-18.) Given the dangers of overdosing, the Court does not find this exercise of discretion objectionable.

Viewing the totality of care Clay and Morrison provided Thomas, the conduct he alleges does not rise to the level of "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff." *See Gutierrez*, 111 F.3d at 1375 (quoting *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983)). Over the many months in which Clay and Morrison provided him with multiple brands of prescription and non-prescription pain medication on a daily basis, refusals on a magnitude of ten, particularly given the aforementioned circumstances, do not strike the Court as anything more than "isolated incidents" in Thomas's overall treatment. *Id.*

Thomas submits an affidavit from Terry Lovette, a registered nurse, who opines that Clay and Morrison violated the standard of care in the correctional nursing community by refusing to give Plaintiff three days of Tylenol upon hearing a complaint, as opposed to one day's dosage, or make follow-up doctor referrals. (*Id.* at ¶ 11.) This information is irrelevant. "[T]he Eighth Amendment is not a vehicle for bringing claims for medical malpractice." *Snipes*, 95 F.2d at 590. Even gross negligence on the part of Clay or Morrison does not translate into deliberate indifference absent a culpable state of mind. *Id.; see also Vance*, 97 F.3d at 992. Whether Defendants violated the standard of care is unhelpful to the Court's constitutional analysis. The record fails to support any inference of deliberate indifference on the part of Clay or Morrison.

### III. Delayed Access to Medical Care

Thomas generally avers that on a number of unspecified occasions, Clay and Morrison refused his requests to see a doctor or fill out sick call slips. (Thomas Dep. 61:10-62:1.) He also

15

finds fault with Clay's failure to expedite the sick call referrals she did file on his behalf. (Pl. Resp. at 7.) This allegedly led to periods of time in which Thomas was prevented from seeing a doctor to address his pain problems or renew expired pain pill prescriptions. (*Id.* at 42:12-23.)

Thomas was immediately treated by unidentified medical personnel after his injury. (Def. SOF ¶ 13-17.) In the following months, the record indicates that Clay accepted three of Thomas's sick call slips. He submitted the first to her on July 17, 2007, and subsequently saw a doctor on July 24, 2007. (Pl. SOF ¶ 84.) Thomas submitted the second on August 8, 2007, a few hours after he saw a doctor that same day, and a third on August 17, 2007, after which Thomas was seen by a doctor on August 21, 2007. (Pl. SOF ¶ 79, 85.) Beyond Thomas's testimony, there is no evidence that Morrison ever accepted any sick call slips from him.

After more than twenty regular appointments with doctors, PAs, orthopedists, and therapists, an August 2008 x-ray revealed that Thomas's physical condition remained relatively unchanged since he incurred his injury a year earlier. (Def. SOF ¶ 32.) Consequently, prolonged pain is the only possible harm incurred by Defendants' alleged refusals to issue sick call slips or referrals. Delays in medical treatment that unnecessarily prolong or exacerbate pain may violate the Eighth Amendment. *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Such delays are actionable even without a showing that the delay aggravated the underlying condition. *Grieveson*, 538 F.3d at 779.

### A. Detrimental Effect

A prisoner bringing a claim for delayed access to medical care must make a showing of harm. Specifically, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston*, 100 F.3d at 1240

16

(quoting *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995)) (italics in original); *see also Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir. 1988).

In *Williams v. Liefer*, the plaintiff survived summary judgment because medical records and expert testimony showed that nitroglycerin immediately relieved his severe pain and lowered his dangerously high blood pressure, yet the defendants offered no reason for waiting hours to administer the drug. 491 F.3d at 713-16. Similarly, in *Gil v. Reed*, a retaliatory delay in treating a serious infection that resulted in many hours of severe pain created a genuine issue of fact, where the plaintiff presented evidence that his pain was alleviated within 24 hours of taking the withheld antibiotic. 381 F.3d at 662. Finally, in *Grieveson v. Anderson*, the plaintiff presented evidence that he was not taken to the hospital until one and a half days after he first informed prison officials of his severely painful broken nose. 538 F.3d at 779. The Seventh Circuit held that this met the verifying evidence requirement because it could help a juror to determine whether the delay in taking the plaintiff to the hospital unnecessarily prolonged or exacerbated his pain. *Id.*

Unlike the above cases, Thomas fails to present any evidence that the alleged delays in scheduling appointments detrimentally affected, unnecessarily prolonged, or exacerbated severe pain. Critically, the record does not suggest that expedited doctors' appointments would have ameliorated Thomas's suffering or condition. Until Thomas was referred for elective surgery in October 2008, he was never prescribed anything more for his shoulder than pain medication, a sling, and general admonishments to continue with his therapy exercises. (Thomas Dep. 50:5-57:14; Def. Ex. 3 at 299-310, 354-74.) Yet, throughout his testimony, Thomas repeatedly asserted that his prescribed pain medication did not help him. (*Id.* at 45:12-15, 46:12-15, 76:14-20.) Between October 2007 and November 2008, Thomas filed seven grievances stating that his

pain medication was not working, and that only surgery could relieve his shoulder pain. (Def. SOF ¶ 64.) Thomas consistently expressed at medical appointments and in call slips that his pain continued unabated, despite his prescribed course of treatment. (Def. Ex. 3 at 299-310, 354-74.)

Thomas conceded, after some prompting, that his sling and physical therapy exercises helped "a little." (Thomas Dep. 52:14-53:15, 54:6-23.) Even then, these measures were not contingent on doctor's appointments; they were pursued on Thomas's own time or at regularly scheduled occupational therapy appointments. (*Id.* at 53:8-15, 54:11-23.) Although elective surgery was considered as early as November 2007, Thomas was not referred for surgery until October 2008, notwithstanding his multiple grievances. The CCDOC Appeal Board approved of Thomas's conservative course of treatment until that time because it classified his condition as not urgent. (Def. Ex. 7 at 240.)

Thus, even when construing the facts in Thomas's favor, Defendants' alleged delays at worst increased the time between Thomas's pre-surgery appointments, in which doctors renewed prescriptions for medications that were, in Thomas's own opinion, ineffective in relieving his shoulder pain. Any scheduling delays Thomas suffered from Clay and Morrison's refusals to issue sick call slips, make referrals, or expedite appointments are therefore insufficient to violate the Eighth Amendment.

### B. Serious Harm & Deliberate Indifference

The Court has already found that an issue of fact exists as to whether Thomas had an objectively serious medical need for pain medication. Assuming that Thomas had also presented verifying medical evidence of the detrimental effect of delayed doctors' appointments, his claim would still fail the second prong of the *Farmer* test.

Certainly, a refusal to supply Thomas with sick call slips or make referrals upon request

18

is reproachable conduct. However, Thomas offers no evidence to indicate that Clay or Morrison withheld call slips or otherwise delayed referrals with deliberate indifference. As set forth above, the record does not suggest that Defendants knew of a serious medical need for pain medication, much less a doctor's urgent care, after the timely expiration of certain of Thomas's prescriptions. Likewise, there is no evidence that Defendants inferred that they courted a substantial risk of harm by occasionally delaying referrals after Thomas's prescriptions lapsed as scheduled. Defendants were, at most, privy to facts compelling the conclusion that Thomas endured some amount of pain; over the course of ten months, Thomas lodged at least ten complaints with each of them, received various courses of prescription-strength and non-prescription-strength pain pills, and wore an arm sling for some time. But Thomas offers no evidence that observable indicators of a substantial risk of harm were ever available to Defendants. Accordingly, the alleged risk of delaying or withholding a referral was not obvious, nor was Defendants' conduct inherently dangerous in this case.[2]

Ultimately, the record does not support the inference that Clay and Morrison knew of and disregarded an excessive risk to Thomas's health or safety. "[T]he Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but *only* [to] that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Snipes*, 95 F.3d at 590 (quoting *Hudson v. McMillian,* 503 U.S. 1, 19 (1992) (Thomas, J., dissenting)) (italics in original). Because Defendants lack the requisite culpable state of mind, and because the record does not reveal that delay resulted in any

---

[2] Moreover, when considering the totality of care Defendants provided Thomas, during which they administered multiple prescriptions on an almost continuous basis for over ten months, a failure to immediately pursue referral requests upwards of ten times does not support a finding of deliberate indifference. *See Gutierrez*, 111 F.3d at 1374-75 (where recipient of ten months of treatment complained of a two-week delay after submitting 16 unsuccessful requests to be seen by a doctor, and another week-long delay after submitting nine such requests, the seventh circuit found that the delays did not constitute deliberate indifference).

detrimental effects, Thomas's constitutional claim fails.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in full.

Enter:

/s/ David H. Coar

David H. Coar
United States District Judge

Dated: **May 25, 2010**